**UNITED STATES of America, Plaintiff,**

v.

**WESTERN ELECTRIC COMPANY, et al., Defendants.**

**Civ. A. No. 82–0192.**

United States District Court, District of Columbia.

Jan. 13, 1986.

Kevin R. Sullivan, Michael Altschul, Luin Fitch, J. Philip Sauntry, for U.S.

Jim G. Kilpatric, for AT & T.

Michael H. Salsbury, for MCI.

Kenneth E. Millard, for Ameritech.

Robert V.R. Dalenberg, Marion Stanton, for Pacific Telesis.

OPINION

HAROLD H. GREENE, District Judge.

Pending before the Court for decision are a number of motions by various Regional Holding Companies for clarification of the decree.[1] The motions represent the view of several of the Regional Companies[2] that they are entitled under the decree to engage in a substantial range of telecommunications activities without obtaining waivers pursuant to section VIII(C) of the decree. In each case, the proffered interpretation is opposed by other entities, both commercial and governmental, which argue that the particular activities are prohibited by the decree.

After careful scrutiny of all the relevant factors, the Court has determined that the interpretations of the decree advocated by the Regional Companies in these motions are inconsistent with the language, history, and purposes of the decree,[3] and that all

1. Ameritech has filed three of these motions, requesting that the decree be interpreted to permit Regional Companies to provide (1) cellular radio services outside their geographic regions, (2) voice storage and retrieval services to cellular customers, and (3) shared tenant services. Pacific Telesis asks that the decree be clarified to allow it to provide exchange telecommunications services outside of California and Nevada. NewVector's motion asks for a ruling that its provision of cellular radio services outside of the U S West region is authorized by the decree. Each of the motions is supported by several other Regional Companies.

2. Although the line of business restrictions in section II(D) of the decree are addressed to the Operating Companies without any explicit reference to the Regional Companies (which did not exist when the decree was negotiated), they clearly also apply to the latter, and arguments to the contrary (see note 18 *infra*) are without merit.

Section III provides that the provision of the decree shall be binding upon the parties and each of the Operating Companies, including "their affiliates, successors and assigns...." Section IV(A) goes on in pertinent part to define an "affiliate" as any organization or entity under direct or indirect common ownership with or control by AT & T, and "subsidiary" as any organization or entity in which AT & T has stock ownership, and section IV(C) defines the term "BOC," *i.e.,* Operating Company, *inter alia,* as "any entity directly or indirectly owned or controlled by [an Operating Company] or affiliated through substantial common ownership."

The Regional Companies were created prior to divestiture pursuant to the Plan of Reorganization as wholly-owned subsidiaries of AT & T. That plan, submitted by AT & T to the Court for approval pursuant to section VIII(J) of the decree, implemented divestiture in part by requiring AT & T to contribute its stock in the Operating Companies to the seven newly-created Regional Companies and then separating these companies from AT & T. The plan proceeded on the premise that regional centralization of the ownership and management of the Operating Companies would result in a more efficient and practical restructuring of the local telephone industry than would have been possible with the establishment of all twenty-two Operating Companies as entirely independent and unrelated entities. See Part IV(A)(6) of the Plan of Reorganization notes 422 and 423. *See also, United States v. Western Electric Co.,* 569 F.Supp. 1057, 1062 n. 5 (D.D.C.1983), *aff'd, California v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983); Department of Justice Competitive Impact Statement, 47 Fed.Reg. 7170, 7174, 7175 (February 17, 1982).

The Department of Justice's Competitive Impact Statement, in discussing the possibility that the Plan of Reorganization might be implemented by AT & T's transfer of the portion of its business providing local exchange service to new corporate entities, noted that "the local exchange enterprises would become [Operating Companies] for the purposes of this ... [j]udgment regardless of their corporate name." 47 Fed.Reg. at 7174.

It is clear from the decree, the Plan of Reorganization, the Court's Opinions, and the Competitive Impact Statement that the establishment of the Regional Companies served only logistical purposes, and that it was not to have any substantive effect on the obligations of the entities exercising local telecommunications authority. It is likewise clear that the Regional Companies are bound by the decree both as subsidiaries of AT & T prior to divestiture and as affiliates of the Operating Companies subsequent thereto. Insofar as the prohibitions in the decree are concerned, the Operating Companies and the Regional Companies occupy identical positions, and the two types of entities will generally be referred to herein without distinction. See *United States v. Western Electric Co.,* 604 F.Supp. 256, 257 n. 3 (D.D.C.1984); *United States v. Western Electric Co., supra,* 569 F.Supp. at 1062 n. 5.

3. See *United States v. AT & T,* 552 F.Supp. 131 (D.D.C.1982), *aff'd, Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983); *United States v. Western Electric Co.,* 592 F.Supp. 846, 855–58 (D.D.C.1984).

the motions for clarification [4] must therefore be denied. Before discussing the motions in detail, it is appropriate to restate the basic purpose underlying the prohibitions imposed by the decree on the local companies.

I

*General Considerations*

A central rationale for the divestiture of AT & T was the recognition that, when one company engages both in monopoly activities—*e.g.*, the provision of local telecommunications service—and in competitive activities—*e.g.*, the provision of interexchange [5] and information services—it possesses the incentive and the ability improperly to exploit its local monopoly power in at least two ways.

First, such a company may subsidize its competitive ventures with income generated by the local telephone ratepayers (who, unlike the customers of a competitive enterprise, lack the ability to go elsewhere for their telephone service and who can therefore be charged whatever rates the local regulators can be persuaded to approve); [6] and second, it can give preferential treatment [7] to its own competitive affiliates, thereby impeding the success of non-affiliated competitors or even forcing them out of business. [8] Evidence was adduced by the government in the trial of this case that the Bell System was guilty of such practices. [9]

The history of the government's struggles with AT & T [10] indicated to those who negotiated and approved the current consent decree that, when the local companies were divested to continue on their own the provision of the local monopoly telecommunications services, they had to be prohibited from engaging also in competitive long dis-

---

**4.** As MCI correctly points out, only a few months ago the Court established a detailed procedure and guidelines for Regional Companies to follow in requesting waivers from the line of business restrictions of the decree. The "clarification" strategy employed by the Regional Companies would undercut that process for the securing of relief from the provisions of the decree by the simple act of labelling the pleadings as requests for clarification rather than as motions for waivers or for modifications. MCI Opposition to Ameritech's Motion to Provide Cellular Service at 2–3.

**5.** Interexchange services will sometimes also be referred to herein as long distance services, although some intra-LATA services—which are permitted to the Operating Companies—may also be regarded as long distance.

**6.** See discussion in *United States v. Western Electric Co., supra*, 592 F.Supp. at 853–55.

**7.** Such preferential treatment might consist, *inter alia*, of slowdowns in the interconnection of competitors' networks to the local switches; the grant of higher quality access to the monopoly provider's own competitive services; abusive regulatory and legal tactics; the manipulation of price for access; and the design of the local networks in such a manner as to discourage competition in the information field. See *United States v. AT & T*, 524 F.Supp. 1336, 1353–57 (D.D.C.1981).

**8.** See Competitive Impact Statement, *supra*, 47 Fed.Reg. at 7171.

**9.** For example, there was evidence to support the Justice Department's claims that AT & T engaged in the types of practices referred to above to impede interexchange competition from such companies as MCI, and to hinder competition in the sale of telecommunications equipment from a number of small manufacturers and suppliers. See *United States v. AT & T, supra*, 524 F.Supp. at 1348–57; see also, *United States v. AT & T, supra*, 552 F.Supp. at 160–62.

**10.** An antitrust suit brought against AT & T in 1949 resulted in a consent decree signed in 1956, but that decree soon proved to be inadequate to solve the problems created by AT & T's status and actions. Thereafter, the Federal Communications Commission conducted several studies and took a variety of actions but in spite of these efforts it ultimately appeared that these activities could not, by themselves, overcome the advantages possessed by the Bell System, including its mixed monopoly-competitive position. It was because of these advantages that the instant lawsuit under the antitrust laws was brought in 1974 and maintained consistently thereafter by the Ford, Carter, and Reagan Administrations in spite of pressure to abandon it from both AT & T and several government departments. See generally, *United States v. AT & T, supra*, 552 F.Supp. at 170; Competitive Impact Statement, *supra*, 47 Fed.Reg. at 7171–72.

tance and information services.[11] Accordingly, a specific prohibition to that effect—one of the few decree provisions directly applicable to the local companies—was incorporated in the decree.[12]

The logic of such a provision was as obvious as its incorporation in the decree was crucial. Without it, the result of the break-up would have been to exchange one nationwide monopoly with the incentive and ability to exploit monopoly power and injure competition for several smaller monopolies with the identical incentives and abilities. The only distinction between the "old" Bell System and the present Regional Company system was and is that the Bell monopoly was nationwide in scope while each of the seven Regional Companies possesses an equally powerful monopoly[13] in a particular geographic region.[14]

Insofar as the threat of injury to competition, competitors, and ratepayers is concerned, that distinction is one without a difference, for the "bottleneck"[15] monopolies continue to exist as before. These bottlenecks—*i.e.*, the local companies with their ownership of the local switching systems and thus of the pathways which the interexchange and information providers must use if they wish to reach the ultimate consumers[16]—merely changed hands: instead of being controlled by the management of AT & T, they are now being controlled in each region by the management of a particular Regional Company. However, the ability to exploit the bottlenecks anticompetitively has remained precisely the same. It was on this basis that the prohibition against the provision of interexchange and information services became a central part of the decree.

That prohibition has far from outlived its usefulness.[17] Indeed, it could with some justification be argued that the Regional Companies, though obviously smaller than the Bell System, present dangers to competition that are in some respects even greater than those presented by that System.

AT & T was imbued with a service mentality, a tradition dating from the days of the chairmanship of Theodore Vail and continued through that of John deButts and Charles Brown. Although the company may have engaged in some or all of the anticompetitive activities with which it was charged, the balance wheel of the service tradition was always present. By contrast, the Regional Companies, or some of them,

---

**11.** Not one of the designated chief executive officers of the soon-to-be established Regional Companies suggested or intimated in the public interest proceeding held by this Court that, in addition to the local monopoly role assigned to them by the decree, the companies needed, required, or were at all interested in providing interexchange or information services. Although the companies which these executives represented were at the time still parts of the Bell System, they were encouraged by the Court, and they did, speak candidly about a number of issues of concern to these companies. See *United States v. Western Electric Co., supra,* 569 F.Supp. at 1062 and n. 4.

**12.** Section II(D)(1) provides that after completion of the reorganization, "no [Operating Company] shall, directly or through any affiliated enterprise ... provide interexchange telecommunications services or information services...." The only other specific prohibition, found in section II(D)(2), prevents local operating companies from manufacturing customer premises equipment, and was included in the decree because of concern over the potential for similar types of anticompetitive behavior.

**13.** The Regional Companies exercise these monopolies through their affiliated Operating Companies.

**14.** See Parts III and IV *infra,* for a discussion of the current efforts of the Regional Companies to break down even the geographic restrictions of the decree.

**15.** See *United States v. Terminal R.R. Assn. of St. Louis,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973).

**16.** Although there has been some "bypass" of the local telecommunications systems which could potentially decrease dependence upon the bottleneck facilities controlled by the Regional Companies, by and large the technology and the economics are still such that the monopoly of these companies on local telephone service with respect to the overwhelming majority of the population has not been impaired.

**17.** See discussion *infra,* note 26, on provisions in the decree for reviewing and removing decree's restrictions on the Regional Companies.

indicate by their public statements, their advertisements, and their rush to diversification, combined with their relative lack of interest in basic telephone service itself,[18] that an ascent into the ranks of conglomerate America rates far higher on their list of priorities than the provision of the best and least costly local telephone service to the American public.[19] Anyone faced with the prospect of permitting these companies to enter competitive markets, particularly the interexchange and the information markets,[20] would therefore have to exercise considerable caution lest the companies be empowered, even encouraged, to use their local monopoly advantage as a means to decimate the competition in these markets and thus to enhance further their conglomerate ambitions.[21]

Moreover, unlike the Regional Companies, the Bell System was constrained significantly by the 1956 consent decree in that many of the newer technological markets, *e.g.,* computers, were out of its reach, and the System's managers were therefore content to concentrate their efforts on telecommunications. The Regional Companies,

---

**18.** Some of these companies, although created by the decree as providers of local telephone service, do not even acknowledge that the provisions of the decree apply to them, and they insist that the Court should not be concerned with the quality and price of such service. Reply Comments of U S West to Ameritech Motion for Shared Tenant Services at 2 note 2; U S West Post-Hearing Statement of August 14, 1985 at 10.

The assumption that high-quality, low-cost telephone service would be provided by the local companies was an essential ingredient in the Court's determination that the consent decree was in the public interest; in the Court's successful request for several modifications of the decree (to grant authority to the Regional Companies to market CPE and the Yellow Pages); and in the Court's demand for changes in the Plan of Reorganization (to transfer the "Bell" name and logo to the local companies and to award them access to AT & T's patent licenses). *United States v. American Telephone and Telegraph Co., supra,* 552 F.Supp. at 192–94; *United States v. Western Electric Co., supra,* 569 F.Supp. at 1078–81; *United States v. Western Electric Co.,* 569 F.Supp. 990, 996–97 (D.D.C. 1983). In light of that history, disdain shown by some Regional Companies for their telephone obligations is as inexplicable as it is disconcerting. Of course, not all the Regional Companies are oblivious of their obligations. See, *e.g.,* BellSouth Post-Hearing Memorandum of August 14, 1985.

**19.** Although corporations engaged in competitive enterprises may merge, acquire, be acquired, or enter into foolish or unprofitable ventures, subject only to the discipline of the market and of such antitrust considerations as may be applicable, public utilities are not under such discipline and are in a different position: as the name implies, their *raison d'etre* is to serve the public. See generally, Garfield and Lovejoy, *Public Utility Economics,* 1–36 (1964). The public is entirely dependent upon the service they provide; it has a vital stake in its continued availability; and it can therefore always be depended upon to bail these companies out—through high or repeated rate increases granted with the compulsion of law by regulatory bodies—should they be neglectful or commit errors which jeopardize the continued availability of the service. See *United States v. Western Electric Co., supra,* 592 F.Supp. at 869–70. See also, *Re Tax Treatment of Accelerated Depreciation,* 33 P.U.R.3d 209, 214 (1960).

As a necessary corollary of the ability to command rates that generate profits, and in recognition of the public interest in such companies, most public utilities are closely regulated on both the state and federal levels as to what non-utility businesses they may operate. Holding companies owning public utilities are likewise closely regulated as to other businesses they may acquire or retain. See, *e.g.,* Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 *et seq.; Michigan Consolidated Gas Co. v. SEC,* 444 F.2d 913 (D.C.Cir.1971); *Re Pequot Gas Co.,* 53 P.U.R.4th 598, 617 (Conn.1983).

**20.** It is with respect to these markets that the local telecommunications monopoly is most suspectible of successful anticompetitive manipulation.

**21.** The decree in this case did not distribute the bulk of the assets of the American Telephone and Telegraph Company to the Regional Companies to enable the managers of these companies to use them as building blocks for the establishment of conglomerates unrelated or only marginally related to basic telephone service for the American public. See also, note 18, *supra.* These companies inherited billions of dollars in tangible and intangible assets at the time of divestiture because the Court and others concluded that these assets would be used in the public interest, that is, in the provision of excellent yet low-cost telephone service to American consumers, and that this objective would be accomplished without the re-creation of the dangers to fair competition that existed before. This Court firmly intends to enforce the decree in light of that purpose.

by contrast, are already expanding in almost every conceivable way, from real estate ventures to foreign trade, from publishing to computer retailing. Financial subsidies from ratepayer-supported local telephone activities to these many types of operations are both easier to hide and harder to detect than subsidies to only a few "outside" enterprises, and so are manipulations of the local loops to disadvantage the many competitors in the myriad of enterprises in which the Regional Companies are engaged.[22]

■ Through the memoranda filed by the Regional Companies in support of the Ameritech motion runs the thread that greater competition and the participation of more competitors in the telecommunications markets are in the public interest [23]—certainly an unexceptionable point as a generality. However, such arguments are drained of much of their persuasive force when they are applied to a situation where the would-be competitors could readily take advantage of their monopoly status in a variety of ways vis-a-vis their non-monopolistic competition.[24]

For that reason, the participation of the Regional Companies in the markets they wish to enter [25] would not be likely to promote genuine, fair competition; the more probable outcome would be that such entry

---

**22.** The Regional Companies claim here, as they have claimed earlier in other matters before the Court, that protection against anticompetitive practices and ratepayer gouging may safely be left to the local regulatory bodies. See *United States v. Western Electric Co., supra,* 592 F.Supp. at 854–55; *see also,* Ameritech Motion to Provide Cellular Services Outside its Region at 14; Reply Comments of U S West to Ameritech Motion to Provide Shared Tenant Service at 18; U S West Post-Hearing Statement of August 14, 1985 at 10–13. That, too, was an argument used by the Bell System, but on examination it was usually found to lack substance. See, *e.g., National Association of Regulatory Utility Commissioners v. F.C.C.,* 525 F.2d 630, 636–38 (D.C.Cir. 1976). The broad sweep of the Regional Companies, with their various competitive and noncompetitive subsidiaries and affiliates, constitutes a significant impediment to effective oversight by local regulators who are confined to a single State. In any event, the Court is not relieved of its obligations under the decree (see section VII, VIII) because others may have responsibilities in related areas.

**23.** See, *e.g.,* Ameritech Motion to Provide Cellular Services Outside of Region at 3, 8–17.

**24.** An additional argument being advanced by the Regional Companies is that, should they not be permitted to enter the interexchange markets, their financial ability to render local service, and hence that service, will suffer. See, *e.g.,* Ameritech Motion to Provide Shared Tenant Services at 5, 8–9; 15; Comments of US West in Support of Ameritech's Motion to Provide Shared Tenant Services at 8–10. The Court has granted numerous waivers of the line of business restrictions to allow the companies to engage in a great variety of "outside" businesses. See, *e.g., United States v. Western Electric Co., supra,* 604 F.Supp. at 257; Memorandum Order of August 22, 1985; Order of August 14, 1985; Order of May 24, 1985; Order of March 1, 1985.

There is no reason why they cannot prosper financially in the exchange telecommunications and exchange access markets, the CPE and the directory advertising markets, and the new and legitimate outside enterprises which they have been allowed to enter. And in fact, they do appear to be flourishing financially. *See text to note 60, infra.*

The Regional Companies would be assured of extra-substantial financial profits in the interexchange and information markets only if they behaved the way the Bell System was found in several lawsuits to have behaved: by artifically disadvantaging their competitors in these markets with respect to access to the local networks or by cross-subsidization. See *United States v. AT & T, supra,* 552 F.Supp. at 189 n. 235.

**25.** To be sure, the current motions do not baldly assert that the Regional Companies have the right under the decree to engage in the interexchange and information businesses without limitation. It is worthy of note, however, that representatives of these companies are widely quoted in the press as desirous of breaking down these prohibitions entirely. See, *e.g., Washington Post,* December 30, 1985, Washington Business Section at 1, 13; *Business Week,* December 2, 1985, at 94, 97, 101; *Wall Street Journal,* November 25; 1985, at 1, 22; *New York Times,* December 2, 1985, Section D, at 4; *Wall Street Journal,* February 24, 1984 at 40.

In any event, as discussed below, were the motions to be granted, the effect would be to position these companies on a slippery slope from which they could readily move to yet broader participation in the forbidden markets. That this concern is not chimerical is borne out by experience. To cite but one example out of several, in 1983 the Court granted the requests of some of the Regional Companies for entry into cellular markets outside of their exchange boundaries in several areas. *United States v. Western Electric Co.,* 578 F.Supp. 643 (D.D.C.

would deny to others engaged in commerce in those markets the level playing field to which they are entitled under law, under the decree, and in plain equity and justice.[26]

The current motions must and will be considered in that context.

## II

### Shared Tenant Services

 In its shared tenant services motion, Ameritech[27] is asking for an order which would "clarify" the decree[28] to the effect that it permits the Regional Companies to provide certain shared tenant services,[29]—the marketing of automatic carrier selection and traffic analysis.[30]

The shared tenant services market has developed substantially over the past few years,[31] for such services present several advantages to both developers and tenants.[32] Accordingly, several independent companies have entered these markets, and the Regional Companies now seek to pen-

1983). Although that granted was limited to nine metropolitan areas with special problems, although it was explicitly described as so limited, and although it was clearly only a waiver of decree provisions, the Regional Companies are now blandly claiming that this precedent entitles them to enter the cellular market as of right, without a waiver, and on an unlimited, nationwide basis. See Ameritech Motion to Provide Cellular Services Outside of Region at 15 and note *; Ameritech Reply Memorandum on Motion to Provide Cellular Services Outside of Region at 7–8; Reply of NewVector to Responses to Ameritech's Motion at 3. The limitations at issue are too critical to the health of the nation's telecommunications industry to be so whittled away.

26. The Regional Companies also suggest as a justification for being permitted to enter the markets at issue here that they are or soon will be beset by competition for the local telecommunications markets, in the form of bypass or otherwise. Section VIII(C) of the decree provides for this eventuality by stating that an Operating Company may enter a prohibited market when there is "no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter." With respect to interexchange and information services, that means that an Operating Company may enter these fields when its own local monopoly has ended and there is substantial competition in the particular local telecommunications market. *United States v. Western Electric Co., supra,* 592 F.Supp. at 867–68. No movant has claimed that this condition now exists, and it plainly does not.

27. The Ameritech motion is supported by two other Regional Companies, US West and Southwestern Bell.

28. As its true with respect to all the motions, if the decree were "clarified" as the Regional Companies request, it would permit them to avoid having to meet the test of section VIII(C)—that there is no substantial possibility that they could use their monopoly power to impede competition in the market they seek to enter.

29. Shared tenant services are the provision by a developer or building owner of a package of telecommunications and related services to tenants. Tenants' needs are then served on a shared basis using centralized voice and data switches and computers on the building premises. Ameritech Motion to Provide Shared Tenant Services, Exhibit A, at 2.

30. Automatic carrier selection, a feature which can be offered through a shared PBX or Centrex, permits the switch to be programmed so as to select automatically an interexchange carrier for the caller. Such selection may be but is not necessarily based upon the lowest cost. In a shared tenant system, the provider programs the switch, and when a tenant thereafter attempts to make an interexchange call, the switch selects the pre-programmed carrier.

Traffic analysis involves the compilation and collation of data on the tenants' telecommunications usage—both individual and aggregate. Such analysis, when performed by a Regional Company, permits that company to recommend exchange and interexchange services as well as CPE and access lines to handle the traffic.

31. According to Ameritech, before 1983 there were virtually no buildings with advanced shared-service capabilities while today there are some 70 such facilities in operation and another 50 expected shortly. Ameritech Motion to Provide Shared Tenant Services, Exhibit C, p. 2. *But see* Reply of Multi-Tenant Telecommunications Association (MTTA) to Comments on Ameritech Motion to Provide Shared Tenant Services at 4–5. According to some, that development is due to the competitive availability of interexchange services.

32. Among the benefits to tenants are the cost savings associated with the aggregated demand which, depending upon the pricing policies of the providers of the services, may permit these tenants to acquire customer premise equipment, exchange services, and interexchange services at lower, volume-based prices. Tenants may also have available to them a broader range of prod-

etrate them as well. However, as will be seen, the shared tenant services at issue in this motion are interexchange services, and the local companies are therefore prohibited by the decree from providing them.

### A. *Regional Company Contentions*

■ The Regional Companies concede that the proposed activities are in the gray area of an "overlap" between exchange and interexchange activities,[33] but they go on to argue that where this is the case, the decree permits them to engage in all of the activities involved in the overlapping areas, both exchange and interexchange.[34] That reasoning is erroneous if only because it proves too much. The very nature of modern telecommunications requires the two functionally distinct systems to meet: access to interexchange services is obtained through the local exchange provider and both use the same equipment.[35]

The overlap is thus inherent in the technology,[36] and to cede the area it covers to

the Regional Companies would allow them to enter the interexchange market by the back door on a wholesale basis[37] when their front-door entry into that market is prohibited by the most basic provisions of the decree. See section II(D)(1) of the decree which provides, without exception or ambiguity, that "[a]fter completion of the reorganization ... no [Operating Company] shall ... provide interexchange telecommunications services...." In short, the "overlap" argument entirely lacks merit.

### B. *Shared Tenant Services Are Interexchange Services*

There is an even more fundamental reason why the requests of the Regional Companies must be rejected—one that relates to the kinds of activities that are subsumed under the rubric of shared tenant services.

Both from the point of view of the statutory language and from that of the purpose of the decree, the prohibitions in section II(D) restrict the Operating Companies not

---

ucts and services than would be true otherwise. See generally, Ameritech Motion to Provide Shared Tenant Services, Exhibit A, at 4–5.

**33.** US West takes the position that the proposed activities are neither interexchange in character nor in a gray or overlap area but constitute exchange functions. Comments of US West to Ameritech Motion to Provide Shared Tenant Services at 10–17. There is no validity whatever to that contention. The US West argument proceeds on the basis of two premises: (1) that all telecommunications functions performed within an exchange area are exchange services except only those which actually cross exchange boundaries, and (2) that "interexchange telecommunications" and "interexchange telecommunications services" represent identical concepts. For the reasons discussed in the text below, both of these premises are erroneous.

The only other Regional Company to file a memorandum on this issue (Southwestern Bell) supports Ameritech. Oppositions were filed by AT & T, MCI, TDX Systems, Inc., the North American Telecommunications Association (NATA), MTTA, and the Department of Justice. Sharetech (a partnership consisting of United Technologies Building Systems Company and AT & T Information Systems) initially filed comments opposing the Ameritech motion but subsequently withdrew these comments.

**34.** Ameritech Memorandum in Support of Motion to Provide Shared Tenant Services at 2–14, 15–16.

**35.** In fact, the "exchange access," over which the Operating Companies have jurisdiction, is defined in section IV(F) of the decree "as the provision of exchange services for the purpose of originating or terminating interexchange telecommunications."

**36.** The division between exchange and interexchange services is fundamental, representing a line of certainty in an otherwise volatile and rapidly developing industry. A grant of Ameritech's motion would introduce the kind of uncertainty into the system that could be used by the Regional Companies to advance ever deeper into the interexchange business even as they retain their local monopolies. See note 25, *supra*; pp. 1097–98 *infra*; and see, Response of NATA to Ameritech Motion to Provide Shared Tenant Services at 3.

**37.** Ameritech goes so far as to assert that, since "[c]oordination between exchange and interexchange services is essential to prevent degradation of services," and since "[c]oordination between CPE and interexchange services is also vital," the Regional Companies must be allowed to operate over the entire range of the overlap (Memorandum at 17), lest they be "imprison[ed] ... in a narrow, unworkable range of activities, threatening their competitive viability in their permitted lines of business" (Memorandum at 17–18). If this line of argument were to prevail, it would completely undermine the prohibitions of the decree.

merely from providing transmissions from a point in one exchange area to a point in a different exchange area but also from engaging in activities that comprise the business of providing interexchange services.

If the decree had been intended to restrict the local companies only from the interexchange transmissions themselves, a prohibition on the provision of "interexchange telecommunications" would have been entirely adequate. But the decree goes further to prohibit these companies in section II(D)(1) from providing "interexchange telecommunications *services.*" The term "services" obviously has, and it must be accorded, meaning and, as will now be seen, that meaning is far broader than is implied by the construction of the statute advocated by the Regional Companies.

■ We begin with the obvious. The Operating Companies are excluded from the provision of interexchange services in order to prevent them from becoming competitors of the interexchange carriers. See Part I, *supra.* On this basis, many of the arguments advanced by the Regional Companies—designed to demonstrate that there is little likelihood of their steering the shared tenant customers to one interexchange carrier rather than another [38]—are largely beside the point,[39] for they fail to address the principal problem to which section II(D)(1) of the decree is addressed: *the threat of competition by the Regional Companies themselves in the interexchange business.*

Interexchange transmission capacity is transformed into an interexchange service that can be offered for hire,[40] *i.e.*, an interexchange business, by the performance of functions that are normally and necessarily performed by those who are engaged in that business (and who would therefore be competing with the Regional Companies with respect to these functions if the motion were granted). The issue of what constitutes an interexchange service or business is most usefully considered in the context of what the Regional Companies would be doing with respect to shared tenant services in the event the motion were granted and to compare these activities with the activities of interexchange enterprises.

First. The Regional Companies would, at a minimum, be aggregating demand within a building and purchasing bulk interexchange services based on that demand for resale to the end users, *i.e.*, the tenants.[41] The purchase of *interexchange* capacity on a wholesale basis (*i.e.*, at prices

---

**38.** See Ameritech Motion to Provide Shared Tenant Services at 21.

**39.** That is not to say that the ability and the incentive of the Regional Companies to cooperate with particular interexchange carriers and to favor them in various ways is not a problem in terms of local company participation in shared tenant activities. Even though a particular Regional Company might not be directly selecting a certain interexchange carrier, it would be a simple task so to perform the traffic analysis and so to arrange the marketing that the carrier favored by the Regional Company would emerge as the ultimate selection. Further, the Regional Company would in any event be marketing a telecommunications package that included interexchange services—a fact that would give the company a strong incentive so to manipulate the switching and the priorities that the interexchange carrier selected for the shared system would prevail over competing carriers.

Moreover, the success of a developer's offering of a shared system would depend in significant part upon the success of the Regional Com-

pany in "selling" to the tenants the interexchange services included in the automatic carrier selection service. Thus, even if the Regional Company did not itself select the interexchange carrier, once it began marketing the package, it would have a direct financial interest in ensuring that a particular mix of carriers—those offered by the developer in conjunction with the Regional Company—was selected.

**40.** See section IV(P) of the decree.

**41.** To be sure, Ameritech argues that such aggregation of demand by the Regional Companies allows tenants to obtain CPE, exchange, and interexchange services at lower, volume-based prices than their individual demand would justify. That may well be true, but Ameritech does not discuss the alternative: that entities other than monopoly exchange providers would perform this service for tenants, and that they, too, could do so at volume-based prices. However, the important fact for present purposes is that aggregation and resale constitute interexchange business activities.

that reflect total demand in a particular context) and its sale at retail clearly constitutes the provision of interexchange services under the decree.[42] Those engaged in such an activity are referred to as resellers, that is, interexchange providers.[43]

If the Regional Companies performed such an activity, that is, if they purchased interexchange services at a bulk price based on the demand in a particular building and then sold such services at retail at higher prices to the building's tenants—they, too, would be resellers in the interexchange business, and they would be in direct competition with other resellers and with facilities-based interexchange carriers.

Second. The Regional Companies expect to perform these functions by making selections of interexchange capacity on what they deem the lowest-cost basis [44] and by marketing the services thus assembled.

Given the existing technology and the economics of the interexchange business, the selection process is exceedingly complex, involving many variables.[45] Both facilities-based carriers and resellers market their services based on comparisons of their particular rates, or mix of rates, with the rates of their competitors in the interexchange business, in efforts thereby to persuade the ultimate users to purchase their services rather than those of other interexchange providers.

These marketing features are also integral to the shared tenant services plan of the Regional Companies, and these companies would thus be directly competing with the legitimate interexchange providers through their own rate comparisons. One example of such a rate comparison already in being is a promotional brochure published by the provider of shared telecommunications services to the World Trade Center building in New York City soliciting potential subscribers among the building tenants by comparing its offerings against the offerings of other providers and by comparing its rates directly with those of AT & T, MCI, and Sprint.[46]

Third. The Regional Companies would not only be purchasing and marketing interexchange services, they would also be selecting carriers for their customers and procuring additional interexchange services for them.

**42.** The aggregation and resale function is crucial to the success of a shared tenant services enterprise. See Ameritech Motion to Provide Shared Tenant Services at 5, 8, 21; see also, Bell Atlantic Reply at 9, 10–11; US West Response at 8; see also, the statement of Ameritech's Indiana Bell Communications subsidiary which described a shared tenant service as a "resale of long distance" (July 27, 1984 presentation on Multi-Tenant Services in Indiana). Department of Justice Memorandum of August 27, 1984, Appendix B.

**43.** Many of the companies engaged in the interexchange telecommunications business do not own transmission facilities but are resellers. Resellers are considered common carriers by the FCC. See Competitive Common Carrier Service, Second Report and Order, 91 F.C.C.2d 59 (1982), on reconsideration, 93 F.C.C.2d 54 (1983).

**44.** Ameritech Motion to Provide Shared Tenant Services at 19, 21.

**45.** Facilities-based interexchange carriers, such as AT & T and MCI, provide interexchange services through many offerings with differing rates, from high-priced ordinary MTS service, through discount WATS service, to even lower-priced dedicated network and other bulk rate services. Special rates may be offered to customers depending upon the volume of their business, and the cost of the service may further vary depending upon the time of day, the route, the relative occupancy of the circuits and switches, and other factors.

**46.** Department of Justice Memorandum of August 27, 1984, Appendix D. It may be expected that a prospective customer of a shared tenant services system would compare the cost of the Regional Company package with the cost of bulk rates offered by a single interexchange carrier or perhaps a package of shared tenant services offered by a joint or cooperative venture of interexchange carriers. In that situation, there could be no question that the customer would be choosing interexchange services between competing businesses, and that the Regional Company managing its shared tenant service would have every incentive to do whatever it could to ensure that the customer chose its system. See, *e.g.*, pp. 1102–03 *infra*.

In connection with the phase-in of equal access,[47] the interexchange carriers are undertaking elaborate and expensive campaigns, through the media and otherwise, to induce individual customers to presubscribe to their particular services. The cooperation of the Operating Companies is an essential element in that effort[48] to bring about free and fair competition among the various interexchange carriers,[49] and the Operating Companies are even "expected to assist the interexchange carriers by means of such measures as making lists of non-presubscribed customers available to them."[50]

An analysis of the shared tenant services proposal of the Regional Companies indicates that they expect to stand this presubscription process on its head. Instead of assisting the interexchange providers in their efforts to "sign up" interexchange customers, the Regional Companies are seeking to offer a presubscription option of their own. If the Ameritech motion were granted, the tenant-customers would be expected to subscribe not to a legitimate interexchange carrier but to the Regional Companies, and those companies, in turn, would make the arrangements for choosing the interexchange services and options to serve those customers.

Here again it is clear that the functions involved—the selection of carriers and the procurement of interexchange services—constitute integral parts of the interexchange business, and that, by performing these functions, the Regional Companies would be directly competing with the interexchange carriers for that business.[51]

Fourth. The Regional Companies would be performing the interexchange switching and routing function, which takes calls from customers and directs them to their destination. That function would be performed by these companies in lieu of its performance by an interexchange carrier, particularly where the calls would not simply be routed to a particular carrier but to a particular service of a carrier, such as a private line.[52]

However, the switching and routing functions quite obviously constitute key parts of the interexchange business, and the Regional Company activities in that regard would be performed in direct competition with the interexchange carriers in the interexchange business.

In addition to the general threat arising from the Regional Companies' monopoly there is a special threat to fair competition by these kinds of activities, for at least two reasons. In the first place, a Regional Company, unlike any other competitor, could use its market power in the provision

---

**47.** Appendix B of the decree. *United States v. AT & T, supra*, 552 F.Supp. at 232–34.

**48.** The purpose of this effort is to effect a change-over from the AT & T de facto monopoly to a competitive interexchange market.

**49.** See generally, *United States v. Western Electric Co.*, 578 F.Supp. 668, 677 (D.D.C.1983). The Federal Communications Commission has since modified the mechanics of the presubscription process. See generally, *Investigation of Access and Divestiture Related Tariffs*, 50 Fed.Reg. 24982 *et seq.* (June 24, 1985).

**50.** *United States v. Western Electric Co., supra*, 578 F.Supp. at 676 note 41.

**51.** As the Department of Justice has pointed out, the existing prohibition on the selection of interexchange carriers by the Regional Companies does not mean that these companies may not coordinate with such carriers in the installation of interexchange services independently selected and procured by a customer, or that they may not coordinate the testing and repair of interexchange services where they provide the CPE or the exchange access facilities that are links in such services. Memorandum of August 27, 1984 at 29.

Indeed, in order to minimize legitimate complaints from the public about poor coordination between local and interexchange carriers with respect to repair of equipment and otherwise, the Regional Companies should undertake such tasks. To the extent that they may have refrained from doing so in the past as a means of control of these markets, including the interexchange market, this Opinion may induce them hereafter to cooperate more fully with other telecommunications service providers in good faith.

**52.** For example, a Regional Company could direct an interexchange call from City Y to City X by switching it with the City Y exchange area to a private line ending in City X. See also, note 45, *supra*.

of exchange access [53] to maximize the interexchange carriers' costs with respect to such access while minimizing the rates paid for interexchange services by its own shared services enterprise. Furthermore, a Regional Company, again unlike any other interexchange competitor, could use its control over exchange access to become the dominant purchaser of interexchange services in its region, thereby further to establish its dominance with respect to interexchange rates and hence with respect to the interexchange market.

### C. *Potential for Expansion*

All these problems are further exacerbated by the virtually unlimited potential in the event of a grant of the Regional Company request and the absence of a logical stopping point.

As presently framed, the Ameritech motion is restricted to shared services involving only tenants in a particular building. However, neither principle nor technology require such a limitation.[54] Just as it is aggregating the demands of the tenants in a particular building, a Regional Company could as easily aggregate demand with respect to a group of buildings, a section of a city, certain types of businesses, or even among all subscribers to its central office switch.[55] Having done so, it could offer interexchange services to all such subscribers on the same basis as those services would initially be offered to tenants in one building.

What would thus be likely to happen is that, in relatively short order, the Regional Companies would become the purchasers of

interexchange services for all the telephone subscribers in their exchange areas, leaving to the interexchange carriers only the role of providers of leased facilities for integrated interexchange services marketed and offered by the Regional Companies.

That this scenario is not an implausible one is demonstrated by Ameritech's own submission to the Court. In one of its memoranda,[56] Ameritech states:

> Shared-services arrangements can also be provided for building complexes, such as a university campus or an office park. In addition, large individual businesses and institutions may have some of the same economies of scale and centralized management advantages as shared systems because of their heavy usage of telecommunications and related products and services. If desired by these individual customers, Ameritech would provide equivalent packages of products and services.

Whatever one might think of the desirability of such an arrangement in the abstract, it is apparent that, given the historical experience with manipulation and discrimination by those in control of monopoly bottlenecks in the telecommunications market, it is not one to be repeated in slightly different form. See Part I, *supra*. In any event, such a development would be clearly violative of the decree.

### D. *Marketing of Customer Premises Equipment*

■ As part of their arguments in support of the motion, the Regional Companies complain that, should they not be permitted

---

**53.** The Regional Companies presently have a monopoly with respect to exchange access. See section II(D)(3) of the decree.

**54.** As discussed above in note 25, the Regional Companies not infrequently seek to carry limited precedents to unintended extremes. In this particular instance, they could enlarge the permitted area with considerable justitution, given the breadth of the principle that would be established by a grant of the Ameritech motion.

**55.** According to the Department of Justice, in negotiations with Ameritech that company indicated that shared switching arrangements might

be offered to commonly-owned buildings throughout an exchange area, to a single business with multiple locations, or to an organization composed of multiple users (*e.g.*, a bank clearing house on behalf of all of its member banks). As the Department correctly points out, an arrangement under which a Regional Company provided interexchange services to multiple users at diverse locations from a centrally located switch would be an exact reconstruction at the regional level of the pre-divestiture structure of the Bell System. Department of Justice Memorandum of June 29, 1984 at 27–28.

**56.** Memorandum of March 23, 1984 at 3–4, n.*.

to engage in the desired activities, they would have difficulty selling CPE,[57] a market from which they are not foreclosed by the decree.[58] For the reasons cited above, even if this were true,[59] it would be insufficient to override the direct prohibitions in the decree. But the CPE argument is not persuasive in any event.

The most the Regional Companies could hope for in this context would be the striking by the Court of some kind of balance. On one side of that balance would be the assumed possibility that, because of their absence from the shared tenant services market, the Regional Companies would find it marginally more difficult to market some kinds of CPE. This difficulty, in turn, could in theory have two adverse effects: it could reduce the income and profits of these companies, and it could reduce competition in the CPE market.

When these assumed effects are analyzed, however, they are seen to have little weight. Judged by any yardstick, the Regional Companies appear to be doing exceedingly well: their income, profits, and dividends have been rising steadily, and they are prospering probably beyond their own expectations—certainly beyond the expectations of financial analysts who contemplated their future course at the time of the breakup.[60] The short of it is that the companies do not urgently need the additional income that could be generated by their entry into the prohibited markets.

The second prong of the companies' argument is equally weak. The information

services market is hardly a monopoly market: a number of corporations engage in this business, both large and small, and the entry of the Regional Companies is not needed to make it a competitive one.

That is not to say that there would be *no* advantages flowing from the companies' entry into this market; but any such positive developments must be measured against the dangers. As elaborated on above, and as the several successful lawsuits against the old Bell System confirm, there is a serious danger that, when a company mixes both monopoly and competitive enterprises in closely related fields of business, the twin perils of discrimination and cross-subsidization are ever present. It is, of course, for that very reason that the decree prohibits such mixing (see Part I, *supra* ) and for that reason, too, the CPE business may not be used as a springboard for opening the door to markets which are closed to the Regional Companies by the decree.

For the reasons stated, the Court rejects the request that the decree be "clarified" to permit that which, absent a modification or a waiver, it plainly prohibits. The Ameritech motion will therefore be denied.

### III

### *Exchange Telecommunications Outside Regions*

Three of the motions raise the same issue [61]—whether the decree permits

---

**57.** Ameritech Motion to Provide Shared Tenant Services at 5, 8–9, 15; US West Comments in Support of Ameritech's Motion to Provide Shared Tenant Services at 8–10.

**58.** Similar arguments are advanced by the Regional Companies in support of the other motions before the Court. As explained in Part IV, if these arguments were accepted as valid, they would result in a wholesale entry of the Regional Companies into prohibited businesses, all on the premises that this was necessary to protect their legitimate business enterprises. See pp. 53–54 *infra.*

**59.** According to some, the opposite is true. MCI contends that the markets for shared tenant services and for CPE are entirely different. MCI Opposition to Ameritech's Shared Tenant

Motion at 5. Further, MTTA states that independent competitors are significantly disadvantaged in the sale of both CPE and shared tenant services when compared with Regional Companies. MTTA Comments at 6. Only a record compiled in the context of an application for a decree modification or for a waiver could reveal which of these assertions is correct.

**60.** See, *e.g., Financial World,* Jan. 7, 1986 at 57; *New York Times,* November 29, 1985, Section D at 6.

**61.** Ameritech's motion for clarification of the decree regarding the provision of cellular radio services outside the Ameritech region; the motion of Pacific Telesis group for a declaratory ruling that it may provide exchange telecommu-

the Operating Companies to provide exchange telecommunications services outside their particular exchange areas.[62] While the immediate impetus for these requests is the interest of some of the Regional Companies in competing on a nationwide basis in the cellular radio market, the scope of the motions is far broader: it encompasses all exchange telecommunications services.[63] The Court holds that, absent a waiver, each Operating Company may under the decree provide exchange telecommunications services, including cellular radio services, only within its own exchange area.

Section II(D) of the decree prohibits the Operating Companies from providing any product or service other than exchange telecommunications services and exchange access.[64] The Regional Companies subscribing to the motions argue[65] that the service they are proposing to perform constitutes exchange telecommunications, and that for purposes of the decree it is irrele-

nications outside of California and Nevada; and the motion of NewVector Communications, Inc., a subsidiary of US West, for a ruling that NewVector's provision of cellular exchange radio services outside the area served by Operating Companies owned by US West is authorized under the decree. These three motions thus raise similar issues with respect to the interpretation of the decree.

Despite this similarity, US West has insisted that both its views and those of its subsidiary NewVector cannot be properly presented unless each is allowed oral argument through its own counsel. NewVector Motion to Participate in Oral Argument at 6–7; US West Statement of August 14, 1985 at 1. The point is totally without merit.

NewVector has filed a twenty-two page memorandum in support of its motion; a twelve page reply to responses made to the Ameritech motion, with thirty pages of attachments; a seven page reply to responses to its own motion, and an eight page motion requesting leave to participate in the oral hearing, which reiterates the substantive position stated in the other memoranda. US West has filed an eighteen page memorandum in support of Ameritech's motion for shared tenant services with five pages of attachments; a twenty page reply to comments made on that motion; and a seventeen page post-hearing statement—all on the same subject and with reasoning similar or identical to the NewVector submissions. Indeed, the various Regional Companies and their subsidiaries have filed a total of twenty-seven memoranda on the pending motions, all making essentially the same points.

As the Court has noted in the past, all motions and written memoranda and comments are carefully scrutinized on their own merits, and of course it has done so here. The Court schedules oral argument when it concludes that such argument may serve a useful purpose in clarifying issues discussed in the memoranda. See also, Rule 1–9(g) of the Local Rules of this Court. Where, as here, the Regional Companies are arguing from substantially the same legal position and have exhaustively briefed the is-

sues, it would be a waste of the time of Court and counsel to permit each company to argue separately, and the Court has declined to do so here (just as has done in the past). The current motions were argued in support of the Regional Company positions by counsel for Ameritech and counsel for Pacific Telesis, in conformity with selections made by the Regional Companies themselves. Counsel for the United States and for MCI argued in rebuttal, with a brief oral comment from counsel for AT & T.

There is thus no basis for the US West insistence that it should have been heard through oral argument, let alone for its complaint that it had found it "discomforting to be precluded from oral argument while a non-party, MCI," was invited to present its views. US West Statement of August 14, 1985 at 1. MCI was allowed to argue orally because, in addition to the Department of Justice, it was the principal opponent of the requests made by the seven Regional Companies. The Court has no intention of complying with the request implicit in US West's complaint that it entertain oral argument from the seven Regional Companies and their subsidiaries and affiliates while precluding a response from those "non-parties," *i.e.*, intervenors, which are affected by the various Regional Company requests.

62. Indeed, the claim is that the Regional Companies may provide this intra-LATA service outside their own regions.

63. See, *e.g.*, NewVector Motion to Provide Cellular Service Outside of Region at 5 n. 10.

64. Also listed in the decree is any other service "that is not a natural monopoly service actually regulated by tariff." Section II(D)(3).

65. Some of the arguments made by the Regional Companies on this issue are actually couched in waiver, not clarification, terms (NewVector Memorandum at 12) ("cellular radio ... should not be unnecessarily restricted"), or they are totally irrelevant (NewVector Memorandum at 19–21) (contending that the consent decree approved by the Court in a different case—*United*

vant that this service would be provided outside the exchange areas—inherited by the particular Operating Companies by virtue of the decree. However, it is clear for a number of reasons that the Operating Companies were intended to be limited to their own local areas in furnishing exchange telecommunications services.[66]

First. Section IV(G) of the decree defines the nature of the exchange areas as being strictly local by mandating their establishment in accordance with a number of criteria, all of them of a local character.[67] Under the same section, the responsibility for establishing each exchange area is that of the Operating Company servicing the particular area—a provision that supports the conclusion that these companies were not intended to provide exchange services outside their own territorial limits. Likewise, section II(D)(3) of the decree authorizes the Operating Companies to provide, in addition to exchange telecommunications and exchange access service, other natural monopoly services "actually regulated by tariff," again indicating that the degree contemplates the provision by an Operating Company of services under that section only in the area in which it is regulated by tariff; i.e., its "home" area.

Second. The parties' submissions and the Court's decisions with respect to the appropriate size of the exchange areas were based on factors relating solely to the status of the "home" Operating Company [68]—a definitional process that would have been largely devoid of meaning if the Operating Companies had been intended to have nationwide reach with respect to exchange areas.

Similar reasoning was applied to the Bell System's assets. To the extent that they were not awarded to AT & T, these assets were divided among the local companies on the basis of the principle that each Operating Company would provide telecommunications services only in the exchange areas in which it was the dominant telecommunications provider.

Third. When describing the structural changes that would take place following the separation of the Operating Companies from AT & T, the Court stated in the Opinion which approved and explained the decree that "[t]he geographic area for which these Operating Companies would provide local telephone service is defined in the proposed decree by a new unit, the 'exchange area',"[69] and in the Opinion which approved the Plan of Reorganization that "[w]ith respect to exchange telecommunications ... the Operating Companies and the Regional Companies [are] by definition ... limited to clearly defined geographic areas."[70] Further, in comparing the Bell System before divestiture to the telecommunications industry as it would

---

States v. GTE—somehow supports the request for clarification of the decree in this case).

**66.** The Court has previously held that the prohibition on mobile radio services which cross exchange area boundaries may be removed only through a waiver proceeding. United States v. Western Electric Co., supra, 578 F.Supp. at 645–46; see also, United States v. Western Electric Co., supra, 604 F.Supp. at 256 et seq.

**67.** Section IV(G) provides that "exchange area" or "exchange" means a geographic area established by an Operating Company in accordance with the following criteria:
1. any such area shall encompass one or more contiguous local exchange areas serving common social, economic, and other purposes, even where such configuration transcends municipal or other local governmental boundaries;
2. every point served by a BOC within a State shall be included within an exchange area;
3. no such area which includes part or all of one standard metropolitan statistical area (or a consolidated statistical area, in the case of densely populated States), shall include a substantial part of any other standard metropolitan statistical area (or a consolidated statistical area, in the case of densely populated States), unless the Court shall otherwise allow; and
4. except with the approval of the Court, no exchange area located in one State shall include any point located within another State.

**68.** United States v. Western Electric Co., supra, 569 F.Supp. at 995–97.

**69.** United States v. AT & T, supra, 552 F.Supp. at 141. See generally, United States v. ITT Continental Baking Co., 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975).

**70.** United States v. Western Electric Co., supra, 569 F.Supp. at 1081.

exist after divestiture, the Court noted that:

> The Bell System is a vast, vertically integrated company which dominates local telecommunications, intercity telecommunications, telecommunications research, and the production and marketing of equipment. Each of the divested Operating Companies will have a monopoly in only one geographic portion of one of these markets—local telecommunications.[71]

Fourth. The regional and local companies themselves have repeatedly espoused the view that the scope and character of their exchange operations were to be geographically limited. Thus, on May 25, 1983, the Associated Bell System Companies stated in a filing before the Federal Communications Commission that "[n]one of the divested [Operating Companies or Regional Companies] will have control over exchange facilities on a broad national basis. No [Regional Company] will have more than regional ownership of such facilities...."[72] Similar statements were made by individual Operating Companies, including a statement subscribed by several of them that "[u]nder the AT & T Plan of Reorganization (POR), approved by the Department of Justice and the Divestiture Court, the Bell System has been divided both geographically and functionally.

Each divested BOC will serve a territory which is sharply confined."[73]

The oft-repeated assertion of the local companies that they are geographically limited was adopted by the FCC in a Report and Order which stated that "[a]t least with respect to the provision of exchange telecommunications services, exchange access and information service access, the [Regional Companies] will operate only within their own geographic territories. The [decree] does not prohibit the [Operating Companies] from offering CPE outside the geographic area in which they provide exchange telecommunications services."[74]

In the face of the statements made to and by their federal regulatory body, the Court finds disingenuous the present claims of these companies: they have always clearly shared the understanding of the Court that, with respect to exchange services, they were to be strictly local entities, not national corporations providing such services everywhere.

■ Fifth. Even arguments advanced here by the Regional Companies support this construction. Ameritech and others cite the fact that they are not limited to prescribed geographical territories with respect to the provision of directory advertising or customer premises equipment.[75] But these activities are permitted to the

---

**71.** 552 F.Supp. at 187. The Court thereafter consistently adhered to these interpretations. For example, in deciding that the decree did not permit the Operating Companies to provide "any and all mobile radio services without regard to LATA boundaries," it noted that this proposal would permit telephone users to route long distance calls over either the landline interexchange networks or over a mobile radio system, "thus in effect overriding on a large scale the decree's limitations on the territorial reach of the Operating Companies. Such a development would have been entirely inconsistent with the terms and purposes of the decree, and the Court would not have authorized it." *United States v. Western Electric Co., supra,* 578 F.Supp. at 647.

**72.** Reply Comments of Associated Bell System Companies, before the Federal Communications Commission in the matter of Policy and Rules concerning the furnishing of customer premises equipment, enhanced services and cellular com-

munications services by the Bell Operating Companies, CC Docket No. 83–115 (May 25, 1983) at 13 (footnotes omitted).

**73.** Joint Petition for Reconsideration of Indiana Bell Telephone Company, Inc., Michigan Bell Telephone Company, the Ohio Bell Telephone Company, before the Federal Communications Commission in the matter of Policy and Rules concerning the furnishing of customer premises equipment, enhanced services and cellular communications services by the Bell Operating Companies, CC Docket No. 83–115 (February 10, 1984) at 13. See also Reply Comments of Associated Bell System Companies before the FCC, *supra,* at 13–18.

**74.** 49 Fed.Reg. 1190, 1192 (January 10, 1984).

**75.** Ameritech Motion to Provide Cellular Service Outside of Region at 5; Ameritech Reply Memorandum at 8; NYNEX Comments at 2 note **.

local companies on an unlimited geographic basis by an amendment of the consent decree.[76] Thus, the directory advertising and CPE marketing exemptions, rather than buttressing the position of the Regional Companies, undercut it: if a special amendment to the decree was required to allow them to engage in these enterprises on such a basis, they can hardly be deemed to be free to engage in other "outside" ventures without a similar amendment (or a waiver of the line of business restrictions).[77]

Sixth. The local companies have reaped substantial benefits from the interpretations they now seek to disavow. For example, in denying the Department of Justice's motion for reconsideration of the Court's ruling permitting the Operating Companies to market customer premises equipment, the Court noted that these companies

> will be relatively small, geographically dispersed corporations. They will be limited to a narrow range of products and services, ... [and they] will also lack the ability to use various components and affiliates in the pursuit and concealment of anticompetitive conduct.[78]

Seventh. The conclusion that the local companies may not engage in exchange telecommunications outside their own areas is also supported by policy underlying the decree. In order to maintain a stable and effective national telecommunications network, the local companies must work cooperatively in many areas. Together they play an important role in the support of national security and emergency preparedness functions, and they participate in the establishment of national network standards.[79] Competition among these companies with respect to exchange service could, and no doubt in short order would, reduce their incentive to cooperate in these vital areas and thus jeopardize both the quality of the services provided by the national telecommunications network as well as the national defense and emergency requirements of that network.

Eighth. The Regional Companies argue at great length that their entry into the cellular markets on a nationwide scale would not be anticompetitive but would promote competition.[80] However, even without the involvement of the Operating Companies in each others' exchange telecommunications, competition may be expected to flourish in the exchange areas as technology and economics render such competition by independent, non-monopoly competitors feasible.

---

**76.** Sections VIII(A), (B) of the decree.

**77.** Likewise, to the extent that the Regional Companies are providing cellular radio to areas that do not correspond exactly to exchange boundaries (*e.g.,* New York-northern New Jersey) or that one of them is participating in the provision of cellular services in the Gulf of Mexico, they do so only pursuant to waivers, not as of right (*United States v. Western Electric Co., supra,* 578 F.Supp. at 647–49); *United States v. Western Electric Co., supra,* 604 F.Supp. at 263–64), and they have never previously claimed that they could do so as of right.

The Regional Companies argue that the Plan of Reorganization contemplated that they would engage in extraregional cellular operations because a footnote in the Plan (note 386 in Part II(A)(3)(b)(ii)) states that some cellular systems might be owned by joint ventures of Regional Companies in areas that do not necessarily correspond to the companies' regions. This statement, however, occurs in a section of the Plan concerned only with effecting the transfer of AT & T's assets to the Operating Companies, and it was thus referring only to a particular type of ownership arrangement which might be necessary to effectuate that transfer. In context, the footnote does not support the Regional Companies' argument, particularly since these joint ventures were eventually not necessary to effectuate the divestiture. In any event, nothing in the Plan indicates that the Regional Companies would not have had to obtain waivers prior to entering into a joint venture arrangement.

**78.** *United States v. AT & T,* 1982–2 Trade Cases 64,980 (CCH 1982); see also, *United States v. Western Electric Co., supra,* 592 F.Supp. at 852 n. 8.

**79.** See *United States v. AT & T, supra,* 552 F.Supp. at 208–09; *United States v. Western Electric Co., supra,* 569 F.Supp. at 1113–14, 1118.

**80.** See, *e.g.,* Ameritech Motion to Provide Cellular Service Outside of Region at 3, 13; Ameritech Reply in Support of Motion at 3–4; Southwestern Bell Memorandum in Support of Ameritech's Motion to Provide Cellular Service Outside of Region at 7–8.

In any event, to the extent that this argument has any validity, it should be made in support of an application for a waiver pursuant to section VIII(C) of the decree, not a request for clarification. This distinction is not a mere technicality. The grant of waivers may be conditioned by the Court upon provisions designed to protect competition. As applied to waiver applications for cellular operations, the Court might, for example, wish to explore the issue of the provision of "roaming" services to Regional Company customers [81] or the possibility that these companies could make use of the cellular footholds to construct national cellular service network or an official services networks,[82] and to attach appropriate conditions depending upon the results of the inquiry. If the decree were "clarified" to permit Regional Company entry into the cellular market on a nationwide scale, no such inquiries could be conducted and no necessary safeguards could be attached.

The response of the Regional Companies that waiver proceedings are unnecessary because "there is no conceivable threat to competition," [83] that they "would unnecessarily preoccupy the Court and the parties," [84] and that the dangers are "speculative," [85] are unsatisfactory, for they assume what only such proceedings can supply: the answer to the question, in accordance with section VIII(C) of the decree, whether competition could be impeded by these companies in the market they seek to enter.

For the reasons stated, the Court will not approve the "clarification" of the decree the Regional Companies request,[86] and the motions will be denied.[87]

81. Roaming is the ability of a cellular subscriber in one system to obtain cellular services in another system. Absent an arrangement between the customer's "home" cellular service provider and the provider in another cellular system, roaming may be either impossible or at least more expensive. Regional Companies may enjoy a competitive advantage in this regard because of the regional character of their monopoly wireline operations.

82. See Response of Telocator Network of America to Ameritech's Motion to Provide Cellular Services Outside of Region at 6–9; MCI Opposition to Ameritech's Motion to Provide Cellular Services Outside of Region at 6.

83. Ameritech's Reply in Support of Motion to Provide Cellular Services Outside of Region at 13.

84. NewVector Motion to Provide Cellular Services Outside of Region at 4.

85. . NewVector Reply to Responses to Ameritech's Motion to Provide Cellular Services Outside of Region at 8.

86. By a letter dated December 19, 1985, Ameritech asserts that, in a motion filed on December 9, 1985, for a waiver of the decree regarding the application of Pacific Telesis to provide certain mobile radio services, the Department of Justice agreed with Ameritech's substantive arguments regarding the instant motion except only as to the necessity of a waiver. The Ameritech submission does not cause a change in the Court's decision announced herein, for several reasons. In the first place, Ameritech has stated its position in a letter rather by a motion as required under the Rules, and in contravention of the Court's Memorandum dated September 27, 1983. In accordance with that Memorandum, the Court declines to grant leave to file the December 19 letter but has ordered the Clerk to return it to its author. Further, while the Court gives substantial weight to the position of the Department of Justice (see *United States v. Western Electric Co., supra,* 604 F.Supp. at 262; see also, 592 F.Supp. at 873), the responsibility for interpreting the decree is the Court's, not the Department's, and the Department's views, although always regarded as persuasive, are not binding on the Court. Finally, Ameritech's own memorandum interprets the Department of Justice's position to be that the decree does not permit the Regional Companies to provide cellular service outside the appropriate exchange areas or to provide voice storage service in their cellular networks without a waiver. Ameritech Motion to Provide Cellular Services Outside of Region at 2–3.

87. There is a suggestion in several of the papers submitted to the Court that some Operating Companies may be engaged in the cellular business outside their own exchange areas without having secured the necessary waivers. See, *e.g.,* Ameritech Reply Memorandum at 8–9; Pacific Telesis Memorandum in Support of Pacific Telesis' Motion at 9; Bell Atlantic Motion to Provide Cellular Services Outside of Region at 2. To the extent that this is so, the offending companies must, of course, cease such operations forthwith. Furthermore, the Court herewith requests the Department of Justice to investigate whether such violations have occurred, and if

## IV

### *Voice Storage*

Ameritech [88] has also moved for an order declaring that the decree permits it to provide voice storage and retrieval features in conjunction with the provision of cellular radio services.[89] The issues presented by this motion are in some respects an amalgam of the questions discussed in Parts II and III above: as they do with respect to shared tenant services, the Regional Companies claim that they are not prohibited from engaging in the voice storage and retrieval business as such; and, as they assert with respect to the cellular services, they argue that they are free to provide voice storage and retrieval services outside their own regions.

Section II(D)(1) of the decree unambiguously states that "no [Operating Company] shall, directly or through any affiliated enterprise . . . provide . . . information services." Information services are defined in section IV(J) as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information which may be conveyed via telecommunications. . . ." [90] As Ameritech itself has recognized [91] voice storage and retrieval services fall squarely within this definition.[92]

Since voice storage is an information service, and since the Regional Companies are clearly prohibited from providing any information service, there is no basis for a clarification motion: no "clarification" of the decree could change those basic facts, and the motion could appropriately be denied on that basis alone.

What Ameritech is really seeking, it would seem, is an order to remove the information restriction in section II(D). However, that result can be achieved only by a request for modification [93] which might require compliance with the standard established by such decisions as *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), or by a motion for a waiver which makes the showing required by section VIII(C)—a motion which Ameritech has chosen not to file.

Notwithstanding these considerations, the Regional Companies contend that they may legitimately market voice storage and retrieval services without either a modification or a waiver because, as they see it, the "decree's information services prohibition was intended to apply to services provided over the operating companies' landline networks, not to services provided over competitive networks such as cellular radio." [94]

---

the answer is in the affirmative, to recommend appropriate sanctions to the Court. See sections V, VI, and VII of the decree.

**88.** Ameritech's motion is supported by NYNEX, BellSouth, and Southwestern Bell.

**89.** Ameritech defines voice storage as an optional feature that enables a cellular subscriber to store, retrieve, and send messages when his cellular telephone is busy or unattended. Ameritech Motion to Provide Voice Storage at 16.

**90.** An exception exists with respect to the "use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." Section IV(J) of the decree.

**91.** Ameritech's Motion to Provide Voice Storage refers to the service as being encompassed within the "information services prohibition." Memorandum at 9. Further, Ameritech's counsel conceded at oral argument that, were the

services provided in connection with the landline network, their offering by a Regional Company would be prohibited by the decree. Transcript of hearing of August 9, 1985 at 46.

**92.** In fact, the Justice Department's Competitive Impact Statement used voice storage as an example of the kind of information service that would be prohibited under the decree. Competitive Impact Statement, *supra*, 47 Fed.Reg. at 7176.

**93.** US West, for one, appears to recognize that fact (US West Statement of August 14, 1985 at 16), and, implicitly, so does Ameritech when it requests that the Court "reverse the possible competitive [sic] effect of the information services prohibition". Ameritech Motion at 9.

**94.** Ameritech Motion to Provide Voice Storage at 5–6; see also, Memorandum of Southwestern Bell in Support of Ameritech's Motion to Provide Voice Storage at 3–4. Ameritech appears to contend that the Court could make the find-

The basis for the companies' conclusion is not clear. Certainly, it could not rest on language in the decree, for the language contains no such exception. Similarly, that conclusion could not have been derived from any expression of intent by the Court in the 1982 Opinion which explained the decree[95] or by the Department of Justice which performed a like service in its Competitive Impact Statement. Instead, the companies simply assert that the prohibition cannot be deemed to apply to the marketing of services in a competitive environment because the monopoly-competition dichotomy, so it is claimed, forms the basic structure of the decree.[96]

That view of the decree is not only overly simplistic; it is quite wrong. The Regional Companies are not merely prohibited from providing certain types of services depending upon whether the services are in the monopoly or the competitive category;[97] they are prohibited from providing *any* product or service other than those which they are explicitly permitted to market. Since the time the consent decree was modified at the request of the Court, and since the time the Court granted a number of waivers to the Regional Companies, the conceptual neatness advocated at one time by the Department of Justice has disappeared.[98] The Regional Companies now legitimately engage in the monopoly services represented by exchange telecommunications and exchange access pursuant to the original consent decree; in the marketing of two competitive services (CPE and Yellow Pages) in accordance with the decree as modified at the request of the Court; and in the provision of a number of other competitive products and services as permitted pursuant to waivers granted by the Court.

What does remain clear is that the Regional Companies may not provide any product or service—other than those enumerated in sections II(D)(3), VIII(A) and VIII(B)—unless they are authorized to do so by a modification of the decree or by a waiver pursuant to section VIII(C). No Regional Company is attempting in the current motions before the Court to avail itself of either of these remedies.

Moreover, it is not at all certain that the Regional Companies could make the showing required by section VIII(C) with respect to voice storage and retrieval. As the Court has previously noted,[99] part of the reason for barring the Operating Companies from entry into the information services market was to allow competition to develop in that market without hindrance from monopolists. Although the cellular radio market may be competitive, each Operating Company retains a monopoly in its local exchange market, and the presence of these companies on a broad scale in a market closely related to that in which they retain such a monopoly raises some of the very concerns that led to the formulation and adoption of the decree.[100]

---

ing implied by its argument in the context of a request for clarification as distinguished from a waiver motion. Whatever may be the technical appellation of a particular motion, the movant would still have to demonstrate the existence of the condition prescribed by section VIII(C)—that there is no substantial possibility that the movant could use its monopoly power to impede competition in the market it seeks to enter, and the Court would still be required to attach such conditions as would be appropriate to achieve the result required by that section.

**95.** Nor could it have been derived from any other Opinion of the Court.

**96.** See, *e.g.*, Ameritech Motion to Provide Voice Storage at 6–7; Ameritech Reply Memorandum in Support of Motion to Provide Voice Storage

at 3–5; NYNEX Comments in Support of Ameritech's Motion to Provide Voice Storage at 2–3.

**97.** To be sure, as discussed in Part I, *supra,* the decree rests in large part on the need to keep bottleneck monopolists out of competitive markets where their monopoly could afford them an undue advantage. However, as indicated below, it does not follow that a claim of absence of such an advantage is sufficient to override specific decree prohibitions.

**98.** Compare Bell Atlantic Memorandum in Support of Pacific Telesis' Motion at 12.

**99.** *United States v. AT & T, supra,* 552 F.Supp. at 188–89.

**100.** For that reason, among others, the Court rejects the contention that the cellular market presents a competitive situation where "techno-

■ Moreover, the generation of incentives to the Regional Companies to design their local networks in such a manner as to accomodate the maximum number of information service providers was one of the stated reasons for the imposition of the information services prohibition.[101] On this basis, as the Department of Justice correctly points out,[102] the decree's requirement that the Operating Companies provide non-discriminatory information access applies equally to the activities of their cellular subsidiaries.

■ As for Ameritech's concern that it would lose its cellular customers if it could not supply such a service,[103] it is no more persuasive than is the argument made in another motion that the Regional Companies will lose CPE market share if they are not also permitted to enter the shared tenant services business (see pp. 1103–1104, *supra* ). The decree simply does not contemplate that the Regional Companies may use claims of inability to compete [104] with respect to the services they are permitted to provide as levers for prying open markets that are prohibited to them. The Regional Companies' fear of loss of cellular customers is best alleviated by their design of their cellular systems to maximize access of voice storage providers to the cellular network, rather than by attempts to circumvent the decree's purpose through a "clarification" of section II(D)(1).

■ Ameritech's final substantive argument [105]—that the Regional Companies should be able to provide this service because AT & T is permitted to supply infor-

---

logical developments and different market structures negate the purpose and reverse the possible competitive effect of the information services prohibition." Ameritech Motion to Provide Voice Storage at 9. Only a request for modification or for waiver can provide the context for an exploration of that contention as well of other issues, such as the questions raised by Associated Telephone Answering Exchanges, Inc. Response of ATAE at 7–8.

**101.** *United States v. AT & T, supra,* 552 F.Supp. at 189–90. See also, *United States v. Western Electric Co., supra,* 578 F.Supp. at 659 n. 4, where this Court stated that

This prohibition is necessary because the Operating Companies would have both the incentive and the ability to discriminate against competing information providers either by granting more favorable access to the local network to their own information services or by subsidizing their services with revenues from the local exchange monopoly. Moreover, the prohibition against providing information services gives Operating Companies an incentive to design their local networks to accomodate the maximum number of information service providers.

**102.** Response of the United States to Ameritech's Voice Storage Motion at 6–10.

**103.** Ameritech Reply Memorandum at 17. The other Regional Companies (BellSouth, Southwestern Bell, and NYNEX) make similar arguments.

**104.** These claims are, of course, not supported by any record made in the context of a waiver application, and they may well turn out to be erroneous.

**105.** Ameritech makes two additional points which deserve only brief mention.

First, the company claims that its position on information services in the cellular market is supported by this Court's decision of November 1, 1983 authorizing service beyond exchange boundaries by cellular carriers. Memorandum at 8, 13. See *United States v. Western Electric Co., supra,* 578 F.2d at 652–53. This argument is incorrect for the reasons cited in notes 25 and 77, *supra.*

Second, the Regional Companies argue that there is no threat of anticompetitive behavior in the cellular voice storage market because they are required by the Court and the FCC to afford competitors interconnections on the same terms and conditions they afford to their own cellular subsidiaries (Ameritech Motion to Provide Voice Storage at 10 n. *; Ameritech Reply Memorandum at 11 n. *), and because their cellular operations are operated by separate subsidiaries (Comments of BellSouth in Support of Ameritech's Voice Storage Motion at 3).

The Bell System was under an interconnection obligation with respect to the services it provided, yet there was evidence that it did not consistently abide by its responsibilities in that regard. See *United States v. AT & T, supra,* 524 F.Supp. at 1348. This lawsuit accordingly became necessary, and so did the decree in this case. The Court therefore will not rely on injunctive remedies alone. See *United States v. AT & T, supra,* 552 F.Supp. at 167–68. Likewise, the separate subsidiary requirement, while helpful, is obviously not adequate by itself to override the prohibitions in the decree and the dangers that gave rise to their formulation and adoption.

mation services [106]—is frivolous. AT & T no longer provides monopoly services [107]—it is engaged in the competitive marketplace, and for that reason it is not subject to the restrictions which the decree imposes on the Operating Companies which continue to hold local telephone monopolies.[108] To seek to equate the present AT & T with the Regional Companies not only flies in the face of the language of the decree but also contradicts the thousands of words which have been written since that decree was issued—by the Court, by the parties, by the Regional Companies themselves, and by numerous intervenors. Ameritech's attempt to equate the two situations thus serves only to highlight the fundamental flaws in its argument. See note 19, *supra.*

For the reasons stated, it is this 13th day of January, 1986 ORDERED that all the motions be and they are hereby denied.

---

**106.** Transcript of hearing of August 9, 1985 at 46; Ameritech Motion to Provide Voice Storage at 8; see also, Reply Comments of US West on the Shared Services Motion at 8.

**107.** To be sure, AT & T still maintains a very high share in the interexchange market. However, with the arrival across the nation of equal access, as well as for other reasons, that market share is diminishing. In any event, AT & T is faced with significant competition in its markets; the Regional Companies remain de jure and de facto regulated monopolies.

**108.** See also, *United States v. Western Electric Co., supra,* 578 F.Supp. at 659 n. 6.